Earl T. SMITH and Earl T. Smith & Associates, Inc., Appellants,

v.

SABINE ROYALTY CORPORATION, Appellee.

No. 8773.

Court of Civil Appeals of Texas, Amarillo.

Aug. 15, 1977.

Culton, Morgan, Britain & White (Maston C. Courtney), Amarillo, for appellants.

Gibson, Ochsner, Adkins, Harlan & Hankins (S. Tom Morris), Amarillo, for appellee.

ELLIS, Chief Justice.

Sabine Royalty Corporation brought suit against multiple defendants to establish and quiet title to an undivided ⅙ mineral interest in certain land and to obtain an accounting as to damages for conversion of ⅙ of the oil and gas produced from the land. Earl T. Smith and Earl T. Smith & Associates, Inc., two of the named defendants, hereinafter referred to as "Smith," counterclaimed for specific performance of an alleged farmout agreement or contract covering Sabine's ⅙ interest. The jury's verdict was favorable to the defendants, but the trial court granted Sabine's motion for judgment notwithstanding the verdict and rendered judgment favorable to Sabine. The basic question in Smith's appeal is whether Sabine contracted to farmout its working interest in the minerals to Smith. We have concluded that under the facts and circumstances of this case, the parties did not enter into an enforceable contract and thus the trial court's judgment notwithstanding the verdict is affirmed.

The facts giving rise to this controversy had their inception in September, 1974. At that time, El Paso Natural Gas Company owned an oil and gas lease covering ⅚ of the minerals in Section 9, Block M–2, H & GN Ry. Co. Survey, Roberts County, Texas.

On September 17, 1974, El Paso executed a Farmout Agreement with W. P. Buckthal and James B. Franklin. Under this agreement, Buckthal and Franklin undertook a firm obligation to begin drilling a well on Section 9 on or before December 1, 1974. Buckthal and Franklin, in turn, assigned these farmout rights to Smith. As a result of this transaction, by early October, 1974, Smith had acquired ownership of the working interest in ⅚ of the minerals in Section 9, subject to the obligation to commence drilling by December 1. Sabine Royalty Corporation owned fee simple title to the remaining ⅙ of the minerals. Thus, Sabine and Smith had become tenants in common in the mineral estate. *Simpson-Fell Oil Co. v. Stanolind Oil and Gas Co.,* 136 Tex. 158, 125 S.W.2d 263, 267 (1939), reversed on other grounds, 136 Tex. 158, 146 S.W.2d 723 (1935); *Willson v. Superior Oil Co.,* 274 S.W.2d 947, 950 (Tex.Civ.App.—Texarkana 1954, writ ref'd n. r. e.).

■ As a co-tenant with Sabine, Smith had a legal right to proceed to drill and produce oil and gas from the land without Sabine's consent or joinder. *Burnham v. Hardy Oil Co.,* 147 S.W. 330, 334 (Tex.Civ. App.—San Antonio 1912), affirmed on other grounds, 108 Tex. 555, 195 S.W. 1139 (1917). In the event, however, of such drilling and production, there would be an obligation for Smith to account to Sabine for Sabine's proportionate (⅙) part of the value of the oil and gas produced, less Sabine's proportionate (⅙) part of the drilling and operating expenses. *Cox v. Davison,* 397 S.W.2d 200 (Tex.1965).

Smith set out to acquire the rights to Sabine's ⅙ interest. During October, 1974, Smith contacted Sabine's representatives and requested that Sabine join him in his drilling venture or lease or farmout its interest to him. Sabine was initially non-responsive, but Smith's insistence eventually resulted in the following letter, dated November 7, 1974, from Sabine to Smith:

"In confirmation of our recent telephone discussion and with particular reference to your letter dated October 28, 1974, as I informed you the management of this Company does not consider the drilling of your proposed test in the captioned section to be in the best interests of Sabine at this time. We strongly prefer that Section 10 be developed before drilling Section 9.

"If you elect to proceed with the drilling of the Morror test in Section 9, we would be willing to grant an oil and gas lease to our subsidiary, Dalco Oil Company, with the lease to provide for ¼ royalty. Dalco would farmout this leased interest to you subject to the drilling of the proposed test with the understanding that production would be required to earn the interest and Dalco would retain a 50% backin option at payout of the well. By the drilling of your initial test and completing a producer, you would be entitled to 100% of this lease insofar as it covers the acreage allocation to the well, or proration unit and you would further be granted a 50% interest in the lease on any acreage outside the initial proration unit. Assuming you complete a gas well and the usual 640 acres plus 10% tolerance is established as field rules in this area you would, in that case, earn all of this leasehold interest in this section through payout. The farmout would be further limited to rights 100′ below total depth drilled.

"If you wish to pursue this arrangement, please let us know and the appropriate instruments will be forwarded for your approval."

After this letter was sent, the parties did not communicate again until January 9, 1975.

Smith, however, drilled a producing oil and gas well. On January 9, 1975, after he knew the well was a producer, Smith telephoned Sabine's representative and indicated he wished to "reconfirm" the deal proposed in the November 7 letter. Sabine's representative responded that management had considered the matter terminated. On the same day (January 9) Smith sent Sabine a letter acknowledging the telephone conversation and indicating that he wished to "accept the proposal" outlined in the November 7 letter. Sabine replied by

letter indicating that management had already considered negotiations on the matter terminated.

On these facts, Sabine has argued that it, as fee simple owner of the ⅛ of the minerals in Section 9, was entitled to receive ⅛ of the oil and gas produced, subject to its payment of ⅛ of Smith's drilling and other costs of production. It was uncontroverted that Sabine held fee simple title to ⅛ of the minerals as of September, 1974. Accordingly, Sabine would be entitled to the relief for which it prayed unless Smith prevails in its contention concerning an enforceable farmout agreement. *Cox v. Davison, supra.*

Specifically, Smith has contended that Sabine is not entitled to relief because it had farmed out its ⅛ interest to Smith. According to Smith, Sabine's letter of November 7 and Smith's January 9 letter, when read together, constitute a binding farmout agreement contract which Smith is entitled to have specifically performed. The jury findings were favorable to Smith, but the trial court set aside the findings and granted Sabine's motion for judgment notwithstanding the verdict. Smith has appealed on 7 points of error contending that the evidence supported the jury's findings on each of the three issues submitted and that the November 7 letter was specific enough to satisfy the statute of frauds and to be enforceable as a contract. Sabine has presented three cross-points questioning the factual sufficiency of the evidence for the jury's finding on each of the three special issues.

In the first point of error, Smith has argued that the trial court erred in concluding that there was no evidential support for the jury's answer to special issue No. 1. In answering that issue, the jury found that Smith accepted the offer of a farmout Sabine proposed in its November 7, 1974 letter (above quoted) by commencing the well in reliance on the offer.

 In our opinion, however, the November 7 letter was not an offer which could have been accepted by Smith's commencement of drilling. The terms of the letter indicated what Sabine and Dalco (Sa-

bine's wholly owned subsidiary) would be willing to do if Smith elected to drill the well. The language used did not indicate that any offer was being extended at that time. Quite significantly, the terms of the letter invited a response from Smith if he wished to pursue the arrangement. In turn, Sabine would forward the appropriate instruments for Smith's approval. Nothing in the letter indicated any intent to extend an offer which could be accepted by drilling a well. It is our opinion that the letter was only an invitation to further negotiations. It did not contemplate acceptance by performance. The language used by the parties should be accorded its plain meaning in order to arrive at their intention when the instrument was drafted. *Fox v. Thoreson,* 398 S.W.2d 88 (Tex.1966). Plainly, the language used in Sabine's November 7 letter did not contemplate acceptance by drilling. Furthermore, as previously discussed, the November 7 letter clearly indicated that formal instruments would be required before the contract would be complete. The letter expressly made Smith's pursuing the proposal contingent upon his approval of the formal instruments forwarded to him. Where written instruments are contemplated on essential portions of an agreement, the parties are not bound until the instruments are executed. *Edmunds v. Houston Lighting & Power Company,* 472 S.W.2d 797 (Tex.Civ.App.—Houston [14th Dist.] 1971, writ ref'd n. r. e.). Also see *Elkhorn-Hazard Coal Co. v. Kentucky River Coal Corporation,* 20 F.2d 67 (6th Cir. 1927).

In the instant case, Sabine's November 7 letter stated only what Sabine "would be willing" to do if Smith elected to proceed with drilling. This language is indicative of negotiation—not a firm offer. Furthermore, the letter expressly called for execution of formal documents. The letter contained only a few of the terms a farmout agreement or lease would contain and, as hereinafter shown, essential terms of such an agreement were not included. Lastly, the letter called for Smith to communicate with Sabine so that the transaction could become finalized. In our opinion, the No-

vember 7 letter was not an offer which could have been accepted by Smith's commencement of drilling.

Smith, however, testified that he relied on the November 7 letter when he commenced drilling. According to Smith, drilling on the strength of such letters was customary in the business. It is recognized that this testimony by Smith constituted some evidence of reliance, but no evidence of acceptance by drilling. The letter called upon Smith to respond to the proposal outlined; it did not authorize acceptance by performance. The letter, in our opinion, contemplated the making of bilateral contract which would involve the preparation and approval of formal contract documents. Point 1 is overruled.

 In the second point, Smith has contended that the trial court erred in concluding that there was no evidence supporting the jury's response to special issue 3. The jury found that the January 9, 1975 letter by Smith constituted an acceptance within a reasonable time from November 7, 1974. Sabine's letter of that date specified no period of time within which the proposal must be accepted. Both parties have recognized the rule implying a reasonable time for acceptance where none is specified. *See, e. g., Texas Pipeline Co. v. Miller,* 84 S.W.2d 550 (Tex.Civ.App.—Eastland 1935, no writ). The question of what period of time between offer and acceptance is reasonable is a question of law where the facts of a case are not in dispute. *Hatt v. Walker,* 33 S.W.2d 489 (Tex.Civ.App.—Dallas 1930, writ dism'd); *McGary v. Campbell,* 245 S.W. 106 (Tex.Civ.App.—Beaumont 1922, writ dism'd).

In the case before us, 63 days passed between the November 7 proposal and the January 9 reply. The critical facts here are not disputed and we hold that this delay was unreasonable as a matter of law. Under these circumstances, it is clear that the November 7 proposal was not intended to allow Smith to drill the well, determine that it would be a good producer and then accept the farmout agreement. On the contrary, all indications pointed to the fact that both

parties considered the situation as a matter for prompt decision. In Smith's preliminary letters to Sabine, he repeatedly stressed the importance of a prompt reply within 1–5 days.

Smith, however, has contended that he was justified in waiting until he knew the well would be a producer because, under the terms outlined in the November 7 letter, he would not earn an assignment of the lease until production. However, acceptance within a reasonable time was necessary to acquire even the farmout rights from Sabine through Dalco, its subsidiary. Absent such an acceptance, Smith could not have acquired rights under the letter. As above detailed, we do not believe the November 7 letter was an offer to contract. There is no dispute shown by the record concerning the time element, and it is our opinion that a delay in acceptance from November 7, 1974 to January 9, 1975, after the well was drilled and known to be a producer, would not be a reasonable time, as a matter of law. See *Hatt v. Walker, supra; McGary v. Campbell, supra; Lewis v. Clark,* 149 S.W.2d 244, 247 (Tex.Civ.App. —San Antonio 1941, writ dism'd, judgment correct); 1 Corbin on Contracts (1963) § 36, at 147–148. Point 2 is overruled.

In the third point, Smith has argued that the trial court erred in concluding that no evidence supported the jury's finding on issue 3. There, the jury found that Sabine did not intend for formal documents to be prepared and approved before any contract with Smith would become effective. In support of his point, Smith has directed our attention to the rule requiring enforcement of a contract actually made which contemplated preservation of the agreement in a formal document even though the formal documents were never executed. See *e. g., Vick v. McPherson,* 360 S.W.2d 866 (Tex. Civ.App.—Amarillo 1962, writ ref'd n. r. e.). *Pierce Oil Corporation v. Gilmer Oil Co.,* 230 S.W. 1116 (Tex.Civ.App.—Amarillo 1921, writ dism'd).

In the cases applying the foregoing rule, however, the parties to the contract had expressly agreed upon all material terms of

the contract and the contract was enforced on the strength of this agreement. The formal documents were intended only to be a convenient written record of their agreement. In the case before us, the parties never agreed on any of the terms necessary to their contract. The November 7 letter does not reflect that any agreement had been reached between the parties. Instead, it was merely a proposal of what Sabine "would be willing" to do. In our opinion, the rule urged by Smith is inapplicable here because the parties had never reached any agreement on the contract terms. The November 7 letter, according to its plain terms, indicated that Sabine intended that formal documents be prepared and executed before the contract would become effective.

Smith, however, has directed our attention to the deposition testimony of Harold Carter, a Sabine vice-president. Carter testified that it was the normal practice of Sabine's Operating Committee not to record a farmout arrangement in its formal minutes until it was accepted. Smith has pointed out that the committee's formal minutes reflect a discussion about Smith and Section 9.

It is noted that the minutes to which Smith has referred were dated November 1, 1974, six days before the critical November 7 letter was written. Furthermore, the minutes themselves refute any argument that the committee considered the deal consummated on November 1. The minutes indicate that the committee discussed the risks involved and approved "*offering* Mr. Smith a 50-50 farmout on a lease with a ¼ royalty to Sabine." (Emphasis added). In view of this language indicating the committee approved only an offer to Smith, we consider inclusion of a discussion concerning Smith and Section 9 in the minutes to constitute no evidence of probative force to establish that Sabine considered the contract as having been made. Point 3 is overruled.

In the fourth and fifth points of error, Smith has urged that the trial court erred in concluding that the November 7 letter was lacking in essential terms and therefore unenforceable as a contract and in violation of the statute of frauds. Smith's position is that all essential terms of the contract were supplied in the November 7 letter. According to Smith, the contract terms were certain enough to enable the court to determine what the contract is and to require performance. *Johnson v. Snell*, 504 S.W.2d 397 (Tex.1973); *Langley v. Norris*, 141 Tex. 405, 173 S.W.2d 454 (1943).

The letter, however, set down only general guidelines, lacking in specificity in essential respects, as to what the agreement between Smith and Sabine actually might be. To require specific performance, there must be a "clear, definite and precise understanding of all the terms [of the contract]." *Bryant v. Clark*, 163 Tex. 596, 358 S.W.2d 614, 616 (1962). The letter merely outlined a proposal under which Sabine would grant a lease to Dalco at some time and Dalco would, in turn, farm out its interest to Smith. Sabine would retain a ¼ royalty and Dalco would retain a 50% backin option. Regarding the lease from Sabine to Dalco, there is no mention of the effective date of the lease, nor the duration of the primary term. Nothing was said about consideration or how the ¼ royalty would be paid. Furthermore, such common terms as pooling arrangements, offset well obligations, warranties, etc., were not mentioned. Regarding the proposed farmout agreement between Dalco and Smith, nothing is mentioned about any terms other than Smith's drilling obligation, his right to an eventual assignment from Dalco and Dalco's option for a 50% backin interest after payout. No other details of the arrangement are mentioned. It is noted that the letter specified no terms with respect to the eventual assignment from Dalco to Smith.

We are unauthorized to supply the terms of the parties' contract. *Bryant v. Walker, supra.* In our opinion, the terms of the agreement alleged were not sufficiently definite to be specifically enforced. Furthermore, even if the agreement were definite enough to be considered a contract, it would be unenforceable under the statute

of frauds. Tex.Bus. & Comm.Code Ann. § 26.01. That statute provides that a contract for the sale of mineral interests is unenforceable if not in writing and signed by the person to be charged with the agreement.

▇ Decisions rendered under the statute of frauds have held that the written agreement of the parties must contain the essential terms of the contract and that these must be "expressed with such certainty and clarity that it may be understood without recourse to parol evidence to show the intention of the parties." *Wilson v. Fisher*, 144 Tex. 53, 188 S.W.2d 150, 152 (1945); *Boddy v. Gray*, 497 S.W.2d 600 (Tex.Civ. App.—Amarillo 1973, writ ref'd). In the case before us, the proposed oil and gas lease from Sabine to Dalco was identified only as "an oil and gas lease" in the November 7 letter. Similar references have been held insufficient to satisfy the statute of frauds. *Fagg v. Texas Co.*, 57 S.W.2d 87 (Tex.Com.App.1933, jdgmt. adopted).

Smith, however, has argued that the statute of frauds is no bar because the November 7 letter settled all the material terms of the contract and the "details" were to be fixed only by Sabine. The cases upon which Smith relies support, in general, the proposition that "the statute of frauds is met where the contract . . . gives either party the unqualified right or power to make a selection or determination of the details without the necessity of further agreement or approval of the other party." *See Tiller v. Fields*, 301 S.W.2d 185 (Tex. Civ.App.—Texarkana 1957, no writ), citing *Stekoll Petroleum Co. v. Hamilton*, 152 Tex. 182, 255 S.W.2d 187 (1953). *Also see Skeeters v. Granger*, 314 S.W.2d 364 (Tex.Civ. App.—Texarkana 1958, writ ref'd n. r. e.). Smith contends that the November 7 letter grants this power to Sabine.

▇ The November 7 letter, however, does not expressly give Sabine the right to furnish the details of the transaction. In fact, the letter above quoted stated unequivocally that "appropriate instruments" would be forwarded for Smith's approval, if he desired to pursue the "arrangement."

Thus, we cannot agree with Smith's contention that the November 7 letter fixed all the contract terms because Sabine was granted the power to fill in the details of the agreement.

Smith also has relied upon the decisions in *Wilson v. Wagner*, 211 S.W.2d 241 (Tex. Civ.App.—San Antonio 1948, writ ref'd n. r. e.), and *Johnson v. Snell*, 504 S.W.2d 397 (Tex.1973), in support of its contentions. In *Wilson v. Wagner*, the court held that a written agreement which was complete as to its essential terms did not violate the statute of frauds simply because there were other provisions which could have been included in the contract. There, however, the lease defined the consideration, term, rental payments, and other detailed items necessary to the formation of the lease. In this case, none of these essential terms are set out, and it is our opinion that the proposal was not complete as to its essential terms.

In *Johnson v. Snell, supra*, the court held that failure to include the terms of a deed of trust alluded to in the contract did not render the contract unenforceable. We agree with the principles relied upon in that case, but find them inapplicable here. In that case, the contract's meaning was perfectly clear without the terms of the deed of trust. In this case, essential terms of the contract are lacking, and it is apparent that such terms are concerned with matters which vary from contract to contract in the oil and gas exploration business. Points 4 and 5 are overruled.

In the sixth and seventh points, Smith has argued that the court erred in concluding that Sabine's 1/6 mineral interest was not held subject to Smith's leasehold interest and in granting to Sabine judgment notwithstanding the verdict. It has been clearly established that the well could be legally drilled and produced by Smith without the joinder of the other mineral owner, but that action would not subject Sabine to the lease in the absence of an enforceable agreement to that effect.

For the reasons previously set out, it is our opinion that Sabine's letter of Novem-

ber 7 was only an invitation to negotiate a contract, and that it definitely anticipated and required the submission and acceptance of formal documents to effectuate a contract. Further, the letter was so lacking in essential terms that a simple acceptance could not make it an enforceable contract. Even if the letter should be regarded as an offer, it was not established that it was accepted by Smith's commencement of the well in reliance on such purported offer and was not accepted within a reasonable time by the letter of January 9, which was after the completion of the drilling and knowledge that such drilling had resulted in production. Additionally, for the reasons previously stated, it is our opinion that this transaction did not satisfy the requirements of the statute of frauds. Thus, we hold that Sabine's interest is not subject to a leasehold interest and we find no error in the court's granting of judgment notwithstanding the verdict. Points 6 and 7 are overruled.

Pursuant to Tex.R.Civ.P. 324, Sabine has presented three cross-points in which it asserts that the evidence is factually insufficient to support the jury's findings on each issue and that its answers to such issues are against the great weight and preponderance of the evidence.

For the reasons stated in connection with our disposition of points 1–7, it is our opinion that the trial court's action in disregarding the answers of the jury to the issues submitted and in granting judgment in favor of Sabine notwithstanding the verdict was proper. We therefore affirm the judgment rendered. Thus, it is not necessary that we discuss the cross points in further detail. However, in the event that it should be determined that the rendition of judgment notwithstanding the verdict was not proper, we would hold that the evidence is factually insufficient to support the jury's findings and that such findings are against the great weight and preponderance of the evidence, in such event, and only in such event, the judgment would be reversed and the cause remanded.

For the reasons above stated, the judgment of the trial court is affirmed.